Next case is number 06-1147, Mymail Ltd. v. America Online, Med Zero, Inc., Junior Online Services, and others. The District Court in this appeal erred in two principal respects. First, it adopted an erroneous claim construction of the claim term network service provider. Second, it entered summary judgment despite evidence in the summary judgment record that raised genuine issues of material facts. To understand the patent and specifically the terms and claim terms at issue, I think that this is an instance in which a single minute of history may be worth several pages of specification. In the early 1990s, companies arose which were in the business of providing Internet access to consumers. In the early days of that decade, typically those companies would provide end-to-end service. They owned the modem banks and other physical means of connecting customers to the Internet. And they also performed billing and management of the customer relationship. As the decade progressed, some of those companies, which were typically known as Internet Service Providers or ISPs, decided to expand their operations from being purely local to become nationwide. But they were not able to make the substantial capital commitment necessary to establish hardware presence in every market they wanted to serve. Therefore, those companies began to contract with companies, separately owned, points of presence that would provide the hardware necessary to connect the consumer to the Internet. These third parties, some of which are known as, for example, Level 3 and UUNet and Quest, none of which are defendants in this lawsuit, would provide the hardware for connectivity. Whereas the companies like AOL, which used to be a defendant in this action but is now settled, Earthlink and UOL would contract with those companies and would continue to provide the billing and other management of the customer relationship. Both of those entities were still known and continue to this day to be known in popular parlance as ISPs, Internet Service Providers. But this separation of the function of hardware network access and the management of the customer relationship by a different company created certain problems because the entity that was managing the customer relationship was no longer directly connected to the customer. This patent provides a method by which the company that provides the customer service can provide login data, such as passwords and Internet access telephone numbers, transparently to the user. And there are certain advantages to that described in the patent. In order to accurately describe this architecture, which existed already in the marketplace by the time the patent was first filed and provisional in 1997, the drafter of the patent coined the term network service provider to describe the entity that provides the hardware connection to the network. It coined the term access service provider to describe the companies like Earthlink, like UOL and AOL that have traditionally provided the customer management and the billing relationship. It is one of those coined terms, network service provider, the entity that provides the hardware connection to the network, that is the subject of the District Court's first hearing. The District Court initially construed, after the Markman process, the network service provider as being an entity that provides the hardware connection to the network, in most cases the Internet, and that authenticates the user or the customer for access to the network. At the summary judgment stage, the Court essentially adopted a gloss on that construction, providing further that that authentication cannot be, quote, delegated to the access service provider. We submit that that construction was error. Following the typical methodology set forth in Phillips, we look first to the claims. Authentication is a requirement that does not appear in the claims, much less a requirement that authentication must occur only at the network service provider and not at the access service provider. So the Court, at the outset, has created a brand new claim limitation by adding a requirement that there must be authentication at the network service provider. I understand the specification. by querying a database that is located at the network service provider or at a central location or at the access service provider. Precisely the embodiment that the District Court said was the basis for its grant of summary judgment. Now, the only argument that the District Court… What portion of the specification are you referencing now? Yes, Your Honor. I'm referencing Column 6, Line 66 through Column 7, Line 7. That's the reference to authentication? Yes, Your Honor. All right, and describes it as authenticating via the app ID and password received from the user. Yes, Your Honor. And also Column 23, Line 67 through Column 24, Line 7. Now that, that second portion, was the specific embodiment that, as I read the record, you seem to say was not claimed to matter. Well, here is what was said. In that passage that… I do know precisely the passage Your Honor is referring to. And it was a passage in which my mail pointed it. And let me place that passage in context because it's extremely important. At the Markman proceeding, the defendants advocated that the court should bring in to the definitions of network service provider and access service provider a broker function with a long laundry list of specific references and specifications that they asked be imported as limitations under the claim by the definition of those terms. My mail argued at the Markman proceeding that that was not proper. And that in particular, that this portion of the specification to which Your Honor refers related to an invention that was not the subject of the claims. But, critically, my mail did not argue and did not acknowledge that the description of authentication in that portion of the specification, which remember is not even a claim term, was irrelevant to the patent. Indeed, we would submit that the description of authentication in that passage teaches the public that authentication may occur not just on the premises of the network service provider, but centrally or at the access service provider. Unlike, I believe it was the LG case decided by this court… No, but there are two different questions. One is what is authentication? And that, it seems to me, the first reference that you cited, column six to seven, seems to speak to. The second is, where does the authentication, where may the authentication occur? And it seems to me that it's this second passage that you cited that is saying that in this embodiment, parenthesis, not a claimed embodiment, that authentication can occur in some other places other than in the one place that the court found the authentication has to occur, in the claims. So what's wrong with that? I think that all I can say about that, Your Honor, is I don't think the fair reading of the specification, and certainly not a fair reading, this is really the issue, not a fair reading of what my mail said about the specification at the Markman hearing leads to that conclusion. But let's go further. Let's suppose that Your Honor disagrees with me and in fact believes that because that invention was not claimed in this patent, that the specification is not available, is off the books for this purpose. It's also the case that the preferred embodiment says that authentication will normally occur at the network service provider. And we would submit that that word normally is critical here because it raises the clear implication that it's not a requirement of the claims, that the authentication database be located at the network service provider. It may be normally, but it may be somewhere else. Now that's my time at this point, Your Honors, unless there are further questions, I'll reserve the rest of my time for a while. Let's hear it from the other side. Thank you, Your Honor. Mr. Jameson. May it please the Court, it is an honor to be appearing before you today on behalf of my client, Earthling, as well as having the privilege to argue on behalf of the other appellees. I want to turn right to the Column 23, Column 24 issue because I think Judge Bryson, you hit the nail on the head. Mr. Cawley says that at the Markman hearing that my mail explained that portion of the specification in response to an argument that we had made about the broker function. And I'd like to shed some light on that. In the record beginning at A2855 going through about A2860, you'll see that this is at the very beginning of the Markman hearing. In fact, we are at page 19 where we have not even stood up and spoken yet about a claim construction issue. But in fact, my mail is providing an overview of the patent. And there my mail tells Judge Davis that this is a very rich patent with six inventions and 29 columns of text. And the Court asked a very pointed question. This is not quoted in our brief, but this is at A2857. The Court says, quote, you are saying some of these other described inventions in the specifications should not read limitations into the claims. And Mr. Cawley responds, first of all, it is your honor to, as we will talk about in a minute, it is error to read a limitation from the specification into the claim in any event. But it is particularly egregious when what you are trying to read into the claim is a portion of the specification that doesn't even relate to the issued invention. And then a couple of pages later, that is when my mail tells the Court that the single dial multi-login function is a great invention and one day it may issue as a patent. But it has nothing to do with the claims that we are talking about today. And that is what the Court hung his hat on. That's on A2859? That is exactly right, your honor. And so I believe that that portion of the specification should be rightfully out of the case because my mail disavowed it at the morning hearing. In addition to that, this Court has issued a decision. It's the LG Electronics case that Mr. Cawley just alluded to. Decision July 7, 2006. It's 453 Fed 1364. And in that decision, the Court told us that when there is a patent that has been the subject of a restriction requirement and a patentee has made an election between inventions, it is absolutely appropriate as part of the claim construction process to ignore the portion of the specification that has been restricted from the patent. And as the record reflects here, this patent is the subject of six restriction requirements. It was six different inventions. And that's precisely why my mail told the Court at the morning hearing that this is a very rich patent. Multiple inventions in columns 23, 24 in the single dial multi-login function have nothing to do with this case. Now, I want to back up because this Court has made very clear with the Phillips decision, the recent decision in on demand, that we have to understand what the invention is in order to reach the correct claim construction. And there is a fundamental disconnect between the parties as to what this invention is. And if you do anything in this case, what I would ask that you do is that you focus on figure one of this patent. All parties agree that figure one is the place to go to understand this invention. My mail spins from pages 12 through 14 of their blueprint using figure one to describe the invention. They used it at the Markman hearing. We used it at the Markman hearing. And if you look at figure one, what figure one shows is that when a user dials in to the ISP, that something has to happen there before you can obtain an internet connection. And the specification teaches us, at column six, column seven of the patent, that when the user dials in, we have to authenticate the user before we're going to allow that user to obtain access to the internet. And figure one shows that unequivocally. Column six teaches that unequivocally. And importantly, figure one shows, and column seven teaches, that until you obtain an internet connection, this ASP does not exist. In fact, if you look at column seven, line 27, that is the first time that this coined term, internet service provider access service, is ever used in the patent. And what column seven, line 27, says, in accordance with the present invention, an internet service provider access service, or ASP, is connected to the internet 100. It's connected to the internet. And here's the important part. At line 32, after the user gains access to the internet via one of the ISPs, it goes on to say that the client dispatch application can then communicate with the ASP. The specification is unequivocal about that. That until you get to the internet, you cannot get to the ASP. And what the court found in defining the coined term, network service provider, is what's its functionality? It's a coined term. We have to go into the specification to give meaning to this coined term. And if you read the patent specification, beginning at column six, line 31, it states unequivocally, quote, to begin the process of the present invention, close quote. And then it goes on to tell us that the user is going to provide the ISP, what's now the NSP, it's going to provide access information. Access information includes a user ID and a password. And then it tells us that the ISP slash NSP is going to authenticate the user. Because until the ISP NSP authenticates the user, you can't gain access to the internet. That's the whole purpose of authentication, is to keep somebody off the internet that shouldn't be on it. And what the patent teaches us at the end of column six, going over to column seven, is it teaches us exactly what is meant by authentication. And the patent tells us, upon receipt of the access information, the ISP authenticates the user 110. The ISP 102 checks to see whether the PAP ID and PAP password received from the user is valid. If you look at the court's marking ruling, at page five of the court's marking ruling, that is exactly what the court found. The court said, looking at figure one, the user dials into the ISP slash NSP, is authenticated, and then is connected to the internet. And once you're connected to the internet, this user can go to the ASP. That's what this patent is all about. Figure one, column six, column seven, describes exactly what the district court found with respect to the attributes of the NSP. Now, where is the dispute between the parties about the infection? Mr. Colley has told you that this dispute is, this patent is about effectively dividing the functionality of an ISP in half. And the ISP does this management billing function, and then there's this other entity that provides the connection. We don't think that's what this patent is about at all. Because what he is describing is already set forth in this patent as prior art. If you look at column two, beginning at line 25, we learn that there are different ISPs, and they provide different services. Some ISPs provide full service, some ISPs provide less than full service, some provide features such as encyclopedia type information, interactive games, access to otherwise costly databases. That's what an ISP does. An ISP may provide you an internet connection, depending on if they've got the underlying infrastructure. Back in 1995, Earthlink owned its own mobile device, and it also authenticated its users, and it provided you an internet connection. But Mr. Colley has told you that the hardware component, and through this patent, is being delegated to a third party. And what I would ask that you do is take a look at column four, lines 60 through 64. Because there, there's another, and I hate these acronyms, but there's another important... Especially when the parties are using them inconsistently. That's exactly right. That makes it hard. That's exactly right. I'm not, I understand it's part of your case, respective cases, but it does add to the complexity of using the acronyms. At columns four, lines 60 through 64, there is a state, there's this phrase, network access provider, NAP. Companies which own the telephone networks and modem banks, such as AT&T, GTE, UUNet, and PSL. Mr. Colley just stood up here a minute ago and told you, UUNet. That's one of the folks that own the modem banks. The point is, and if you look at their proposed construction, what they're asking is that the NSP be the entity that provides the internet connection. Why did we need to coin a term for that? Why did we need to coin a term in the patent for the party that provides the internet connection when the patent at column four, lines 60 through 64, has told us that the network access provider already exists that does that? Does it make any sense? No, but it doesn't decide the case either. Well, it may not decide the case, but the question is, doesn't the NSP slash ISP, a coin term, doesn't it have to mean more than that? And that's what the court found. Because if that's all that we're talking about here, is a party that provides the network connection, well, the patent's already told us what that is. It's an NAP. And what is the coin term? And this is taught at column five. The patentee teaches us the NSP is equivalent to the ISP. But because this invention may have application to networks other than the internet, we just don't want to call it an ISP here. We want to call it an NSP. And the patent then teaches us the attributes of that NSP ISP beginning in column six. It is the party that provides the network connection, and it is the party that authenticates the user. And that is exactly what the court found in the department ruling, and that's what led to the court's summary judgment decision. I think I'm down to 30 seconds. Can I ask you a question? Yes. Did you have another point? Because I don't want to interrupt you. I've got a bunch of points, but I'd rather answer your questions. Well, Mr. Cawley didn't reach the question of authentication, but I kind of have a feeling that if he had more time, he might have. And that's the debate about whether the issue of authentication was conceded in the course of the Markman argument or whether there was less than concession with regard to all authentication being done as opposed to just, say, a ground-stream check. Can you address that? I think there are maybe two issues there. First of all, the point I meant to hit was the questions, and it shows up between pages 29, 60, and 60, I think, of the argument, if I have the right page there, about the alleged concession with respect to authentication. That's really the main point that I'm about to address. At the Markman hearing, Mr. Cawley stated to Judge Davis and this is a quote, when the user dials into the network service provider, there has to be some authentication. That is one of the things that the network service provider does. Close quote. And that's at page 29, 60, and the transcript is 142, column 2-9. Why isn't it fair to say that that could encompass any form, broadly read, any form of authentication, not necessarily what you refer to as authentication or what the patent recites as the kind of authentication that may be discussed in column 6, but anything including ground-stream? I think, again, there may be two issues there. One, it's the who. Who's doing the authenticating? And what Mr. Cawley is telling us there is that it's the NSP. And then the second issue is, okay, what does authentication mean? And quite frankly, the patent provides us a definition of it at the beginning of the bottom of column 6, going over to column 7. So you see that portion of the specification slamming the door on any definition of authentication, not including password and ID? I would tell you it is compelling evidence that the inventor defined authentication as checking to see whether a path ID and password is valid. But even if arguably authentication means something differently, it's not going to change the outcome of this case. Because it is beyond dispute that in this case authentication is occurring at the Earthlinks, the Junos, the UOLs, the SBCs, where we have databases where path IDs and passwords are being checked. And it's only if they are valid based on what's happening in our databases could a user ever obtain an Internet connection. And so step back for a minute. But correct me if I'm wrong, but I think the third-party modem is doing a RealmString check, right? There is a third-party modem that is looking at a RealmString to determine whether it's an Earthlink RealmString. If it doesn't see something that it recognizes as one of the appropriate categories of RealmStrings, out it goes. That's exactly right. But if it sees something that's an Earthlink RealmString, you're not connected to the Internet. That's the exact question that Judge Davis asked at the summary judgment hearing. At that point in time, you now have passed user IDs and passwords to a database at Earthlink that pursuant to the court's plaintiff instruction cannot be involved in that process. And it's only if Earthlink checks that user ID and password and determines that it's valid, and we agree that that is a user that has the right to get on the Internet, it's only then that authentication has occurred in a way that will allow the user to obtain access to the Internet. And I'm out of time. Good. Thank you, Mr. Jameson. Mr. Colley, I think Mr. Colley would like to return as well if he needs it. Thank you. Thank you, Your Honor. Let me turn first to one of the last questions that was asked about the alleged concession in the department hearing about authentication. On the very page that... I think there are two different issues here, right? One is whether there was a concession, and the other question is to the scope of any such concession, is there a meaning of authentication? Right. Am I reading that right? Well, I think that you are, Your Honor. But the passage that Mr. Jameson quoted was on A2960, and I won't read the whole thing because it's almost a page long, but I urge the court, when reading that page, to pay particular attention to the first sentence, where my mail said, And finally, on the issue of authentication, the court asked a number of real-world questions of Mr. Jameson about how Earthlink does authentication and where it happens and so forth. Then they're proceeding to discuss the lengthy recitation that Mr. Jameson had given of Earthlink's system. Nowhere in this passage is there a discussion of the claims or of anything that might or might not properly be read into the claims from the written specification. There's also a separate portion of that transcript of the Markman hearing, which appears on page 35 of the yellow brief, and the record is at A2938, and I'm sorry to say that I observed yesterday for the first time that that page was accidentally omitted from the appendix,  although what I'm about to read is quoted in the brief. Is there only one page missing? I think we can agree that you can send us that page. Thank you, Your Honor. If Mr. Jameson wants to dispute the content, he can do so. At the hearing, my mail made the statement, Does the NSP communicate with Earthlink to authenticate it? That is not in the claim. What is in the claim is providing the hidden set of log-in data to the user for the subsequent log-in. That's what the claim covers. Whether how the NSP chooses to recognize that log information, whether it has a server on premises, whether it locates it somewhere else, including Earthlink, has nothing to do with the infringement of the claims. Now, we're dealing at two levels here, Your Honor. One level, of course, here is, What will this court decide that a reading of the specification justifies importing into the claim? But on the other level of, What did my mail concede or not concede at the hearing? That passage makes crystal clear that my mail consistently contended that the database on which authentication is queried can be located anywhere. And indeed, the question arises back to the level of, What does the specification require? Where is it in the written description that justifies the district court's requirement that that database against which the query is sent certainly can be located at the NSP, and the district court even said it might be located off the premises of the NSP, but it can't be located physically at the access service provider. Respectfully, that's not in the written description and is not a limitation that should have been imported into the claims. The summary judgment evidence reveals that here's how the authentication actually takes place. The user, that's the customer, has a computer on which there is some software that they have been provided by the access service provider. When they try to log on, that software provides credentials, authentication information, to the network service provider. The network service provider has a server which analyzes that information and confirms the realm strength to determine whether or not that user is indeed a customer of one of the defendant access service providers. The network service provider, at its local server, then compiles that authentication request into what's called radius protocol, as described in the specification of the briefs. It's a certain kind of protocol that's used for authentication. That's done at the network service provider. It then queries, using that protocol, a database, and the patent says that database may be located at the NSP, and we've already been through that, or centrally, or at the ASP. It queries that database, which, in the case of these defendants, happens to be located at their premises. It then receives back the result of that query, which simply says acknowledge or not acknowledge, and it then either grants or denies access to the Internet. That's authentication. It's authentication within the plain meaning of the written description, and it's authentication that's provided by the network service provider, even if this court were to affirm this requirement adopted by the district court. In response, briefly, to Mr. Jameson's point about the architecture already being described in the specification, it's critical to remember that this patent and its claims do not claim as inventive the architecture of the user, the network service provider, and the access service provider. That is merely the environment in which the invention operates. What the claims cover is the provision of access information from the access service provider to the user. That's what the claims cover, not the architecture. And finally, let me address this concept of a coined term. The patent says that the term network service provider is a coined term, and the defendants attempt to parlay that language of coined term into a justification for importing additional limitations into the claim under the guise of defining that coined term. If, though, we consult the written specification specifically on this issue of the coined term network service provider, it tells us in column five, beginning at line 37, it should be noted that while internet terms such as ISP are used throughout this description, the invention is offerable with any network or portion of any network, and thus the terms such as NSP, network service provider, have been coined for use in the claims to identify similar or analogous systems or devices. That tells us that the purpose of coining the term network service provider is not to import an additional limitation which narrows that term, but to the contrary, it was coined to broaden coverage of the claim from a claim reading strictly on the internet to include a claim reading on any network in addition to the internet. For that reason, we would ask this court to reject the defendant's invitation to use the coined term as an excuse for importing unwarranted limitations into these claims to find that the district court committed error in its construction of network service provider and further committed error by disregarding the summary judgment evidence that raises a genuine issue of material fact as to whether authentication, if required, is indeed performed by the network service provider. Yes, that's a good point. This is actually addressed to both parties, and it's not part of the argument, but rather informational for our assistance. Yes, Mr. Jamieson, come forward as well so we can both answer Judge Wilson's question. A lot of the material in all of the briefs is marked as confidential and so much so that as I was going through it and looking ahead to the possibility of our writing opinion, it would pose difficulties to write a coherent opinion without getting inside some of the brackets and disclosing the bracket material. I wanted to know whether you all were prepared to give us some help with respect to limiting or ideally withdrawing the requests that this material be held in a confidential state so that it gives us a little bit more liberty by way of what's on the newspaper. Unless you are about to weigh everything, if you could take copies of the briefs and highlight that which needs to be protected. Really needs. The only material in my mail's brief marked confidential is material produced to us as confidential by the defendant. So we have no objection to a complete... Since there are multiple defendants, it's probably something that you can't do just on the fly. I think that's right, Your Honor. And we will certainly endeavor to go back through the briefs and... To go back, find a convenient way of indicating it. Again, we will try and respect what was initially marked, but it does make it difficult to explain ourselves. We will do so. Thank you. Thank you, Your Honor. Thank you, Your Honor.